IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| X TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CIVIL ACTION NO. 5:10-CV-319-XR |
| v. | § | |
| | § | |
| MARVIN TEST SYSTEMS, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF X TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF
APPLICATION FOR ATTORNEYS' FEES AND COSTS**

TO THE HONORABLE XAVIER RODRIGUEZ, U. S. DISTRICT COURT JUDGE:

NOW COMES Plaintiff X Technologies, Inc. ("**X Technologies**" or "**Plaintiff**") and files

this Reply in Support of Application for Attorneys' Fees and Costs (the "**Reply**"):

## I.    INTRODUCTION

1.    This case was a hard-fought lawsuit involving complex subject matter; production

of voluminous records; numerous witnesses; liability and damage experts; a seven-figure amount

in controversy; an array of defenses; a complex regulatory scheme; multiple rounds of

dispositive motions; and a seven-day federal jury trial.    It is the type of case where it is

reasonable and appropriate to hire a national law firm.    Marvin Test Systems, Inc. d/b/a Geotest's

("**Geotest**") decision to turn down X Technologies' offer to mediate the case before trial, left X

Technologies with little choice other than to continue to vigorously oppose dismissal and to try

the case to a verdict.

2.    X Technologies prevailed at trial establishing the core allegations that: Geotest

agreed to exclusively team with X Technologies; the agreement was breached; and X

Technologies' suffered resulting damages.    It should be no surprise to Geotest that a high

percentage of X Technologies' attorneys fees were in support of its claim for breach of the Exclusive Teaming Agreement, because Geotest argued that X Technologies other claims were indistinguishable from the contract claim.[1]   Further, Geotest's defensive case was largely based upon affirmative defenses to the Exclusive Teaming Agreement claim, in particular prior material breach of contract.

3.    X Technologies' application for attorneys' fees complies with applicable law and presents a well-reasoned segregation analysis.  The fees incurred were usual and customary for a case of this complexity in San Antonio.  X Technologies respectfully requests that the Court award it $714,847.90 in attorneys' fees.

## II.    GEOTEST HAS MISCHARACTERIZED THE NATURE OF THE CASE

### A.    This Case Is Complex Commercial Litigation

4.    The case bore all the hallmarks of complex commercial litigation.  The factual subject matter for the case concerned test engineering of laser guided bombs.  The Federal Acquisition Regulations' complicated scheme of regulations had bearing both on the Exclusive Teaming Agreement and the ultimate government contract being pursued.  *See e.g. In re Vrana*, 335 S.W.3d 322, 330 (Tex. App. – San Antonio 2010, no pet.) (probate matter was akin to a complex business dispute involving regulatory issues).  This case involved fourteen depositions in four states, four experts, and voluminous document production from the parties and non-party Raytheon Missile Systems.  *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 286 (Tex. App. – Fort Worth 1984, writ ref'd n.r.e.) ("lengthy record[s]" and "voluminous testimony and exhibits therein," render cases complex).  *Stuckey v. White*, 647 S.W.2d 35, 38—39 (Tex.

---

[1] Ex. A (Trial Transcript, Vol. 7, 08/31/2011) at 24, 49, 62; Defendant's Motion for Summary Judgment [Dkt. #49] at ¶47.

App. – Houston [14th Dist.] 1982, no writ) (noting that a case involving multiple expert witnesses and a trial spanning two weeks was "factually and legally complex").

5.      The case also required detailed briefing on several rounds of potentially dispositive motions and a seven-day federal jury trial. Unlike *Thomas v. Bobby D. Assocs.*, 2008 WL 3020339, at *4 (Tex. App. – Tyler Aug. 6, 2008, no pet.), which Geotest cites in the Response[2], this case involved multiple dispositive hearings, numerous depositions, and a litany of hard-fought and complex defenses to Plaintiff's contract claims.   Here, as in *Cordova v. Southwestern Bell*, 149 S.W.3d at 441, 448-49 (Tex. App. – El Paso 2004, no pet.) (also cited by Defendant), much of X Technologies' fees were incurred in connection with efforts to respond to Geotest's motions, including a motion to transfer venue, two motions for summary judgment and numerous motions for judgment as a matter of law.  *See also USAA County Mut. Ins. Co. v. Cook*, 241 S.W.3d 93, 102-03 (Tex. App. – Houston [1st Dist.] 2007, no pet.).   Geotest's Response oversimplifies the factual, evidentiary and legal complexity of the case and seeks to minimize the central role of the Exclusive Teaming Agreement played in both the Plaintiff and Defendant's case.

## B.      The Exclusive Teaming Agreement Claim Was Central to the Case

6.      Geotest's Response makes the incredible statement that "the sole issue was Geotest's compliance with one short paragraph in the contract at issue."[3]  Geotest overlooks the fact that that it challenged the existence of the contract; disputed the terms of the contract;

---

[2] Defendant Marvin Test Systems, Inc.'s Objections to Plaintiff X Technologies, Inc.'s Application for Attorneys' Fees and Bill of Costs [Dkt. #177] (the "Response").
[3] Response at ¶ 24.

claimed that it had not teamed with Raytheon; challenged (and continues to challenge) causation;[4] and disputed and presented alternative theories of damages.

7.     Since both Geotest and Raytheon denied that they had teamed together, X Technologies was required to amass and present a large body of circumstantial evidence concerning nature of that relationship.  Proving the relationship between Geotest and Raytheon was the central focus of X Technologies' case.  X Technologies only obtained this evidence through non-party subpoena, successful prosecution of a motion to compel, and depositions taken in New Mexico, California and Texas.[5]  The trial of the case was continued for five months, in large part, based upon Geotest's desire to pursue more discovery from Raytheon.[6]

8.     Geotest Response does not address the fact that X Technologies is entitled to attorneys' fees related to the overwhelming focus of Geotest's case: the defense of prior, material breach.  Geotest spent an enormous amount of time and effort on the defense in dispositive motions, witness examinations, and argument in Court (even in the closing argument after the defense was dismissed as a matter of law).  In addition to prior material breach, X Technologies overcame Geotest's affirmative defenses of: statute of frauds; failure of consideration; unclean hands; estoppel; fraud; inequitable conduct; impossibility; "extinguished" obligations; unilateral mistake; and inability to perform.[7]  None of these defenses are discussed in the Response, yet the Texas Supreme Court in *Chapa* explained:

> [T]o prevail on a contract claim a party must overcome any and all affirmative defenses (such as limitations, *res judicata*, or prior

---

[4] Geotest's argument is entirely inconsistent with its *Renewed* Motion for Judgment as a Matter of Law [Dkt. #176]. For instance, Geotest argues: "Plaintiff needed to present to the jury no more than the USAF's award of the Solicitation contract to Geotest and Geotest's dealings with Raytheon to establish its claim." Response at pp. 12-13. X Technologies' plainly presented this evidence, yet Geotest continues to seek judgment as a matter of law.

[5] *See* Motion to Compel [Dkt. # 41].

[6] Motion for Continuance [Dkt. # 46] at ¶¶ 2-3.

[7] Defendant's First Amended Original Answer [Dkt. #38] at ¶¶ 56-75.

material breach), and the opposing party who raises them should not be allowed to suggest to the jury that overcoming those defenses was unnecessary.[8]

The Exclusive Teaming Agreement was the core of this case and attorneys for both sides focused their efforts on matters for which fees are fully recoverable, including: the formation of the agreement; terms of the agreement; Geotest's dealings with Raytheon; X Technologies alleged breach in submitting alternative proposals; causation and damages.

### C.    X Technologies Achieved a Successful Outcome

9.    X Technologies proved the existence of the disputed contract, overcame all factual denials and defenses asserted by Geotest, established a breach of contract, causation and received a $336,000 award of damages. *See* Verdict Form [Dkt. #168]. The jury expressly noted that X Technologies should recover attorneys' fees and costs. *Id.* at Question No. 3. X Technologies achieved a successful outcome in the case.

10.    Significantly, Geotest refused X Technologies' request to mediate this case. Ex. C (Supplemental O'Donnell Affidavit) at ¶ 3. X Technologies had no opportunity prior to the trial to reach a settlement that would reduce the total amount of fees. The only avenue that X Technologies had to recover on account of Geotest's breach of contract was to overcome Geotest's repeated dispositive motions and win at trial. Refusal to settle a matter on which a party later prevails at trial is a consideration in rendering a fee award. *See Roussell v. Brinker Int'l, Inc.*, No. 09-20561 c/w No. 10-20614, 2011 U.S. App. LEXIS 19027 at *29 (5th Cir. Sept. 14, 2011) (awarding fees and reasoning that the prevailing party "could not have reduced their costs to a level more appropriate with the results achieved," because opposing party "never offered to settle the case.").

---

[8] *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006).

### III. X TECHNOLOGIES HAS PRESENTED A DETAILED, WELL-REASONED SEGREGATION ANALYSIS

#### A. X Technologies Identified and Employed the Correct Segregation Standard

11.     Geotest misstates the standard of segregation articulated by the Texas Supreme Court in the *Chapa* opinion.[9]  Geotest faults X Technologies for not applying a percentage reduction to services rendered for both recoverable and unrecoverable claims.[10]  *Chapa* requires no percentage reduction when discrete legal services do a double duty for recoverable and unrecoverable claims.[11]

12.     X Technologies has applied a percentage reduction to any time entry where a portion of the time expended can be tied solely to an unrecoverable claim.[12]  For instance, X Technologies segregation analysis limits recovery of fees to for drafting pleadings as follows: 65% for the Original Petition; 75% for the First Amended Complaint; and 33% for the Second Amended Complaint.  These percentages were based upon an analysis of drafting time for each document and the claims that the amendments served.

13.     Similar analysis and percentage allocations were applied to any time entry where part of the time related solely to unrecoverable claims.  For instance, the following recovery percentages were applied to attorneys fees: 60% for first motion for summary judgment; 50% to jury charge and 0% to a disputed motion concerning net worth discovery.  This is exactly the type of percentage reduction called for in *Chapa*.[13]  X Technologies counsel further evaluated deposition and trial transcripts to reasonably determine testimony that could have been avoided

---

[9] *See, e.g.*, Response at ¶ 14.

[10] Response at ¶ 10.

[11] *Chapa*, 212 S.W.3d at 313-14 (discrete legal services that advance a recoverable and unrecoverable claim are so intertwined that they need not be segregate).

[12] *Chapa*, 212 S.W.3d at 313 (fees that relate solely to an unrecoverable claim must be segregated even if nominal).

[13] *Chapa*, 212 S.W.3d at 313 (discussing pleadings, jury charge and net worth segregation).

in the absence of X Technologies' tort claims and claim under the NDA. Testimony that fit that category was limited due to the nature of the claims, interrelated evidence supporting the claims and use of a common damage model.[14]  No reduction should be applied to items that would be incurred on the recoverable claim alone, such as briefing on Geotest's second motion for summary judgment that was limited to the issue of causation.

14.     The Bankruptcy Court for the Northern District of Texas recently analyzed the issue of fee segregation in a factually similar scenario in *In re Arnette*.[15]  In that case, the prevailing party "asserted claims for which attorneys' fees were recoverable (breach of contract and suit on a note), and claims for which fees are generally not recoverable (fraud and §§ 523 and 727 of the Bankruptcy Code)."[16]  Concerning services that advanced both a recoverable and unrecoverable claim, the *Arnette* court first reaffirmed *Chapa*'s holding: "[I]t is sufficient for the party seeking fees 'to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours that related solely to a claim for which fees are not recoverable.'"[17]

15.     In overruling an objection that the prevailing party had not properly segregated unrecoverable fees, the court noted that "the [prevailing party] has offered detailed evidence *showing* that Bell Nunnally examined its billing statements line-by-line and reduced its requested fees for any time spent on the § 727 claims."[18]  The court explained that the prevailing parties careful analysis went beyond the requirements of *Chapa* that allows for "an approximate

---

[14] Geotest's Response incorrectly states that X Technologies seeks 100% recovery of "trial preparation."  X Technologies assigned percentages of 90-95% of trial preparation based upon a review of each time entry. Response at ¶ 14.

[15] *In re Arnette*, Bankruptcy No. 09-38643-bjh-7, Adversary No. 10-03062, 2011 WL 3651294 (Bkrtcy. N.D. Tex. Aug. 18, 2011)

[16] *Id.* at *2.

[17] *Id.* at *2 (quoting *RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.*, No. 05-10-00234-CV, 2011 WL 3211360, at *6 (Tex. App. -- Dallas July 29, 2011, no pet. h.) (citing *Chapa*, 212 S.W.3d at 314).

[18] *Id.* at *3 (emphasis original).

percentage to stand in for precise segregation"[19]  As in *Arnette*, Plaintiff in this case has gone

beyond *Chapa*'s requirements.  Plaintiff has not only removed fees for services that solely

advanced unrecoverable claims, but also applied percentage allocations based on task categories

– a process which resulted in a greater reduction in fees sought than a more simplistic

segregation analysis would yield.[20]  Accordingly, Plaintiff's analysis in this case, in the words of

the *Arnette* court, "is the essence of segregation."[21]

### B.    Geotest's Segregation Objections Are Limited and Unsupported

16.    The examples that Geotest cites of alleged improper segregation are unsupported.

Geotest claims that it was improper for X Technologies to include 100% of the fee for preparing

a witness list and exhibit list.[22]  Geotest fails to identify any witness that addressed solely

unrecoverable claims.  X Technologies applied percentages to all trial testimony to account for

the limited time spent solely on unrecoverable claims.  The only trial exhibit that Geotest points

to as unnecessary is the NDA itself; however, the NDA would certainly have been included as an

exhibit if only the Exclusive Teaming Agreement claim had been asserted.  X Technologies'

principal Jesse Ayala testified that the NDA was the first step towards, and started talks

concerning, a teaming relationship.[23]

17.    Geotest attaches Plaintiff First and Second Request for Production and argues that

only 25% of the requests relate to the Exclusive Teaming Agreement.[24]  X Technologies' First

Request for Production contains 40 requests; of which, only requests 1-3 relate exclusively to an

---

[19] *Id.* at *3 (citations omitted).

[20] *See* Motion at Ex. D (O'Donnell Affidavit) at 18; *Exhibit* 1-2.

[21] *In re Arnette*, Bankruptcy No. 09-38643-bjh-7, Adversary No. 10-03062, 2011 WL 3651294 at *3.

[22] Response at ¶ 18.

[23] Ex. B (Trial Transcript, Vol. 2, 08/23/2011) at pp. 87, 157-158.

[24] Response at ¶ 16, Ex. B, C.

unrecoverable claim. 92.5% of the requests relate to the recoverable claim, and X Technologies used a 90% allocation figure for time related to the First Request. Only 2 of the 33 requests in Plaintiff's Second Request for Production (nos. 23-24) relate solely to an unrecoverable claim; thus, X Technologies correctly used an 95% rate of recovery. This is exactly the type of analysis called for in *Chapa*.

18.     Moreover, the fact that much of the fees incurred by X Technologies tied, in whole or in part to the contract claim should not come as a surprise. Indeed, throughout this litigation, Defendant recognized the substantial overlap between X Technologies' contract and non-contract claims. For example, Geotest's counsel accused X Technologies of "conflating" the tort claims and the contract claim and argued that the tort claims were very close to becoming the contract claim.[25] Geotest further argued:

> [A]ll tort claims . . . constitute impermissible contorts . . . *in that these claims and all duties arising in this case arise out of a contractual relationship* that was originally created by the NDA and pursuant to the last provision of the NDA *subsumed the teaming agreement.*[26]

There was significant overlap in the evidence supporting the tort claims and claim for breach of the Exclusive Teaming Agreement. In cases like this, the Texas Supreme Court in *Chapa* expressly recognizes that the fees to be segregated and excluded may be "nominal."[27]

### C.     X Technologies' Calculations Are Accurate

19.     Furthermore, Geotest's identification of $213.77 in math errors on a spreadsheet involving hundreds of entries does not make X Technologies' calculations "suspect." Likewise, the fact that X Technologies shared an early draft of the report that Geotest claims contained

---

[25] Ex. A. (Trial Transcript, Vol. 7, 08/31/2011) at 24, 49.

[26] Ex. A (Trial Transcript, Vol. 7, 08/31/2011) at 62:15-23 (emphasis added).

[27] *See Chapa*, 212 S.W.3d at 313.

more errors is irrelevant and demonstrates nothing more than X Technologies' efforts to meet the conference requirements of Local Rule CV-7(i).

20.    Plaintiff has made the adjustments Defendant referenced in its Response at ¶ 15, and performed an additional quality-control check. Of the entries that required adjustment, the adjustment resulted in a net increase of recoverable fees of approximately one thousand dollars. Plaintiff's aggregate accuracy between submissions is 99.15%. Thus, to the extent there is variation, Plaintiff's fee request (which has not been adjusted to reflect the net increase) is in Defendant's favor.[28]

21.    Additionally, X Technologies is not required to waive the attorney client and work product privileges to recover attorneys' fees. Submission of redacted fee entries is a recognized manner of supporting an attorneys' fees claim. *Blockbuster, Inc. v. C-Span Entm't, Inc.*, 276 S.W.3d 482, 491 (Tex. App.—Dallas 2008, no pet.) (upholding $2.5 million fee award based upon redacted fee entries). X Technologies' fee charts contain minimal redactions and are consistent with, and exceed, the requirements of Local Rule CV-7. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (upholding fee award where invoices were heavily redacted). The fee segregation analysis is further supported by the affidavit of Michael O'Donnell. Dkt. # 173 at Ex. D.

---

[28] The adjustments are as follows:

| | |
|---|---|
| 9/15/2010: | Mr. O'Donnell's time is $329, not $829 (adjusted downward). |
| 11/10/2010: | Mr. Stribling's time is $123.38, not $246.75 (adjusted downward). |
| 4/28/11: | Mr. O'Donnell's time is $1732.50, not $1032.50 (adjusted upward). |
| 8/3/11: | Mr. Stribling's time is $1327.50, not $132.75 (adjusted upward). |
| 8/15/11: | Mr. Fleming's time is $1732.50, not $1032.50 (adjusted upward). |

## IV.   THE ATTORNEYS' FEES CHARGED WERE REASONABLE FOR THIS CASE

### A.   Presumption of Reasonableness

22.   Where Texas law controls the rule of decision, the Fifth Circuit has made clear that:

> Under Texas law, there is a rebuttable presumption that the usual and customary attorneys' fees are reasonable. Further, the Court may take judicial notice of reasonable and customary fees, 'along with the contents of the case file in evaluating a request for attorneys' fees.'[29]

The fees in question are at discounts to the usual and customary rates charged by Fulbright & Jaworski L.L.P. and the fees charged in this case were usual and customary for a case of this nature and complexity in San Antonio. O'Donnell Affidavit [Dkt. # 173], Ex. D. at ¶ 12.[30]

### B.   The Rates Charged Were Reasonable

23.   Consistent with the "lodestar" calculation method, X Technologies seeks a reasonable number of attorney hours at reasonable rates. *See e.g.*, *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 284 (5th Cir. 2008). Attached as a Exhibit 1 to Mr. O'Donnell's Supplemental Affidavit is a chart of aggregate statistics showing total hours sought per attorney and the corresponding rate.[31] The rates include discounts from Fulbright & Jaworski L.L.P.'s standard rates of 10% for Mr. O'Donnell and more than 20% for Mr. Fleming.[32] This case involved complex subject matter; a venue dispute; two rounds of summary judgment briefing; interpretation of a complex regulatory scheme; fourteen depositions (in four states); a seven-

---

[29] *In re Arnette*, 2011 WL 3651294, at *4-5 (citing *Frazin v. Haynes & Boone, LLP (In re Frazin)*, 413 B.R. 378, 415 (Bankr. N.D. Tex. 2009)).

[30] TEX. CIV. PRAC. & REM. CODE §§ 38.003, 38.004 (presumption exists that the usual and customary attorney's fees are reasonable); *see also Chapa*, 212 S.W.3d at 313 (Texas Supreme Court noting that unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be).

[31] Ex. C (Supplemental O'Donnell Affidavit) at *Exhibit 1*.

[32] *See* Application for Attorneys' Fees [Dkt. #173] at Ex. D (O'Donnell Affidavit) at ¶ 27.

figure amount in controversy; and a seven day federal jury trial. X Technologies was justified in hiring a large law firm with a strong reputation and resources.

24.     Plaintiff's counsel are San Antonio attorneys practicing in a 400+ person firm, and the blended billing rate for services for which X Technologies was billed is $382.[33] The 2009 Texas State Bar Hourly Rate Fact Sheet ("**Fact Sheet**") Geotest relies upon reports that the average billing rate of a Texas attorney practicing with a firm of 400+ members is $373.[34] What is more, the average billing rate of a San Antonio attorney who is also a member of a 400+ person firm is $400. To the extent the Fact Sheet is viewed as a reliable study, counsel's fees are consistent with those charged by comparable Texas and San Antonio firms.[35]

25.     This was not an "average" case calling for "average" attorneys, nor are X Technologies' attorneys "average." If the Court elects to use a statistically reported rate, it should be upwardly adjusted based upon the factors articulated in *Johnson v. Georgia Highway Express, Inc.* or the Texas Supreme Court.[36] The factors implicated by this case include: (1) the time and labor required; (2) novelty of the case; (3) skill required; (4) customary fees for similar cases; (5) the result obtained; and (6) the experience, reputation and ability of the attorneys.[37]

---

[33] The blended billing rate for services for which Plaintiff seeks to recover fees for this case was $396.78.

[34] The Fact Sheet is available at http://www.texasbar.com/AM/Template.cfm?Section=Research_and_Analysis&Template=/CM/ContentDisplay.cfm&ContentID=11240

[35] The Fact Sheet involves limited, non-scientific surveying. One can support any number of theories under the Fact Sheet, all devoid of reason, but arguably consistent with "custom." For example, male attorneys in Texas reported an average rate of $240, while Texas women attorneys reported an average of $213.

[36] 488 F.2d 714 (5th Cir. 1974); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

[37] *Johnson*, 488 F.2d 714, 717-719 (5th Cir. 1974).

### C. The Number of Attorney Hours Was Reasonable

(i) *Geotest's Actions Drove the Number of Hours Incurred.*

26.    Geotest caused multiple rounds of briefing by bringing a venue challenge and two motions for summary judgment. Each such motion threatened dismissal of all, or a part, of X Technologies' case and required careful and thorough responses on the part of X Technologies' attorneys. Geotest caused X Technologies to bring and fully brief a motion to compel production before Geotest conceded the motion in its entirety. O'Donnell Affidavit [Dkt. 173, Ex. D] at ¶ 9. Geotest was granted a continuance to pursue months of additional discovery. A party's efforts to make a case lengthier and more complicated are considerations in rendering fee awards. *See Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 626 (Tex. App.—Dallas 1987, writ denied) (fee award seven times the amount of damages awarded "not excessive" in part due to opposing party making existing case lengthier and more complicated); *Commonwealth Lloyd's Ins. Co.*, 678 S.W.2d 286 (finding fees that far exceeded actual damages reasonable where matter was " hotly contested").

27.    Geotest played a material role in making this a large fee case and should not be heard to complain about X Technologies level of preparation. X Technologies level of preparation was important to its overcoming Geotest's repeated dispositive motions and ultimately prevailing at trial.

(ii) *Geotest Dramatically Understates the Amount in Controversy.*

28.    In measuring the reasonableness of the amount of attorneys' fees recovered, a Court considers the amount in controversy.[38] The amount in controversy in this case was $1.1 million, a figure supported by an expert damage model that was not subject to a *Daubert*

---

[38] *See Murrco Agency, Inc. v. Ryan*, 800 S.W.2d 600, 607 (Tex. App.—Dallas 1990, no writ); *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 286 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

challenge. The amount in controversy is not a product of what the jury ultimately awards; but instead, is based upon the claims and damages that were asserted and presented to the jury.[39] The $1.1 million amount in controversy far exceeds Plaintiff's requested fees. Further, from the onset of this litigation, Plaintiff sought recovery of attorneys' fees and exemplary damages. Both parties recognized a substantial fee award would be the inevitable result of this proceeding.

29.    Courts have deemed reasonable attorneys' fee awards that were greater than the actual damages recovered in the case.[40] For instance, in *Northwinds Abatement v. Employers Is.*, 258 F.3d 345, 355 (5th Cir. 2001), the Fifth Circuit affirmed a $712,000 attorneys' fee award on $74,000 in actual damages.[41] Where the amount in controversy is significant, courts have found awards of nearly seven times the actual damages recovered not to be excessive.[42] The *Chaparral Texas, L.P. v. W. Dale Morris, Inc.* opinion, relied upon heavily by Geotest, awards attorneys fees approximately seven times the $10,709 award of actual damages where the total amount in controversy was $160,000.[43]

    (iii)   *X Technologies Did Not Overstaff the Case.*

30.    Geotest mistakes thoroughness for over-preparation.    Courts have recently rejected similar arguments; for instance, in *Amlin Corp. Member, Ltd. v. Logistics Group, Int'l,*

---

[39] *See Murrco Agency, Inc.*, 800 S.W.2d at 607.

[40] *See, e.g., Recognition Commun., Inc., v. American Auto. Assoc. Inc.*, 154 S.W.3d 878, 891 (Tex. App.—Dallas 2005, pet. denied) (fee award that was more than seven times damages was reasonable); *Cordova v. Sw. Bell Yellow Pages, Inc.*, 148 S.W.3d 441, 446 (Tex. App.—El Paso 2008, no pet.) (observing that trial was not complicated, but preparation was and thus fee award that was twice actual damages was reasonable); *Murrco Agency, Inc. v. Ryan*, 800 S.W.2d 600, 602 (Tex. App.—Dallas 1990, no pet.) (fee award that was three times actual damages found reasonable); *Stuckey v. White*, 647 S.W.2d 35, 38-39 (Tex. App.—Houston [1st Dist.] 1982, no writ) (fee award more than double actual damages was reasonable).

[41] *See also Quanta Servs. Inc. v. Am. Admin. Grp., Inc.*, No. 08-20252, 2008 WL 5068804, at *5 (5th Cir. Dec. 2, 2008) (affirming $116,767.68 in attorneys' fees on recovery of $100,000 in actual damages).

[42] *See Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 626 (Tex. App.—Dallas 1987, writ denied) (awarding $162,000 in fees on a $24,067.14 actual damages award, where the amount in controversy was $525,000).

[43] 2009 WL 455282, *1 (S.D. Tex. Feb. 23, 2009)

*Inc.*, Civil Action No. H-09-2695, 2011 WL 3271335, *6 (S.D. Tex. July 28, 2011), the Southern

District of Texas reasoned: "MCPI's summary judgment filings were thorough and careful . . .

They reflect significant time spent reviewing the record, investigating legal theories, and

responding to the numerous issues [the opposing party] raised . . . MPCI's work was not

disproportionate given the challenges and issues [the opposing party] raised and given the nature

of the case."

      31.    Moreover, Geotest points to its own staffing of the case without providing the

Court any information concerning attorney hours incurred or rates.[44] The Court's record reflect

appearances for two partners at Johnson Deluca Kennedy and Kurisky, P.C., Millard Johnson

and Bradley DeLuca, and one associate, Adrian Guerra-Paz. Mr. Johnson was assisted by Mr.

Guerra Paz and a second associate Christopher Johnson at trial. Mr. Johnson, at his partner rate,

handled every deposition, witness and pretrial appearance on behalf of Geotest.

      32.    X Technologies' counsel sought to save money by leveraging the case using its

San Antonio offices two newest litigation associates: Blake Stribling and Ashley Senary. Mr.

Stribling handled the bulk of the written discovery, defended depositions, argued motions and

examined a witness at trial. While Mr. O'Donnell and Mr. Fleming are partner-level attorneys,

they divided work between them and did not appear together at any deposition or pretrial hearing

with the exception of the pretrial conference. During trial, Mr. Fleming and Mr. O'Donnell

billed a reasonable number of hours per day. There was a $24,517 write-off from the trial

invoice that reduced the fees chargeable to the client for attorney participation in trial. [45]

      33.    Geotest's briefing concedes that Mr. Fleming handled separate aspects of the

case, but then argues that X Technologies should recover $0 for Mr. Fleming's efforts because

---

[44] Response at ¶ 26.

[45] Ex. C (Supplemental O'Donnell Affidavit) at *Exhibit 2*.

allegedly X Technologies' experts were not helpful to the jury.[46] No authority supports the idea of excluding an attorney's efforts because he presented a damage expert and the jury elected to not to award every dollar requested. The jury awarded $336,000 based upon the evidence presented, which included the work of X Technologies' damages experts. A prevailing party under Chapter 38 of the TEX. CIV. PRAC. & REM. CODE succeeds on the merits regardless of the amount of damages awarded.[47]

### D.    X Technologies Exercised Sound Billing Judgment

34.     Plaintiff exercised billing judgment. Mr. O'Donnell reviewed each monthly bill line-by-line and eliminated billings for work that was unproductive, excessive, or redundant. Ex. C, O'Donnell Supplemental Affidavit at ¶5. In total, Plaintiff's counsel performed 2,407 hours of work on this matter. Plaintiff wrote-off 230 hours (9.5%), reducing the total billed by $66,409.75, or 7.4%. This method has been approved by the Fifth Circuit as a proper exercise of billing judgment.[48] A spreadsheet detailing the monthly and cumulative write-offs is attached to Mr. O'Donnell's Supplemental Affidavit as Exhibit 2.[49] These line item reductions are in addition to discounts applied Fulbright & Jaworski L.L.P.'s standard hourly rates for Mr. O'Donnell and Mr. Fleming.

---

[46] Response at ¶ 25.

[47] *See Nicholson v. Tashiro*, 140 S.W.3d 445, 447 (Tex. App.—Corpus Christi 2004, no pet.) (amount of damages irrelevant when determining prevailing party); *Johns v. Ram-Forwarding, Inc.*, 29 S.W.3d 635, 638 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (prevailing party based on success on merits even though no damages).

[48] *See Green v. Admins. of Tulane Educ. Fund*, 284 F.3d 642, 661 (5th Cir. 2002) (endorsing a line-by-line analysis and according reduction of the total number of hours billed).

[49] *See Walker v. HUD*, 99 F.3d 761, 769 (5th Cir. 1996) (evidence of billing judgment includes documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant).

**V.    GEOTEST'S ANALYSIS COMPLETELY FRUSTRATES THE JURY'S VERDICT**

35.    The jury plainly wanted X Technologies to be made whole in this case when it added to its award of $336,000 the statement "+ Atty Fees + Court Costs."[50] These matters were left for the Court to ultimately decide, but following Geotest's reasoning would result in a substantial loss to X Technologies and frustrate the jury's intent and verdict.  Geotest asks the Court for a 50% reduction in the blended rate Fulbright & Jaworski L.L.P. charged and then a 66% reduction in the hours expended.    In combination, these moves would result in X Technologies recovering only 17% for the amount it expended in attorneys' fees.[51]

36.    Such a result would be extremely inequitable.  To reach it, the Court would have to be convinced that the lion's share of the time spent on this was *solely* to support unrecoverable claims and defenses to those claims.[52]  The Court would also have to conclude that it was entirely unreasonable for X Technologies to hire Fulbright & Jaworski L.L.P. and that the firm was thoroughly unreasonable in its handling of the case.   None of that is true.

**VI.    ATTORNEYS' FEES FOR POST-JUDGMENT MATTERS**

37.    X Technologies attorneys' fees incurred in connection with its Application for Attorneys' Fees [Dkt. # 173], this reply brief and in responding to Geotest's Renewed Motion for Judgment as a Matter of Law [Dkt. # 176] are fully recoverable.    *See e.g. Roussell v. Brinker Intl'l, Inc.*, 2011 U.S. App. LEXIS 19027 at *29 ($90,000 award of fees incurred after trial, "much of which was spent arguing over fees")   X Technologies respectfully requests an opportunity to present its fees incurred in connection with this briefing.   Alternatively, X

---

[50] *See* Verdict Form [Dkt. #168] at Question 3.

[51] *See Commonwealth Lloyds's Ins. Co.*, 678 S.W.2d at 286 (actual fees should be considered by the Court.)

[52] *Chapa*, 212 S.W.3d at 313-14

Technologies asks the Court to award a reasonable provisional fee to cover legal expenses incurred to conclude proceedings in the trial court.

38.    X Technologies should further receive a provisional award in the event of an unsuccessful appeal by Geotest to the Fifth Circuit. Geotest claims the award should be limited to $30,000; however, the $100,000 award X Technologies requests is more consistent with the expense of appellate briefing and oral argument in the Court of Appeals.

## VII.    X TECHNOLOGIES IS ENTITLED TO RECOVER COSTS

39.    Prior to filing, X Technologies provided Geotest a copy of its application for costs and Geotest failed to present any of its objections to X Technologies cost application during the meet and confer process. After reading this Court's opinion in *Nilesh Enterprises, Inc. v. Lawyers Title Ins. Corp.*, 2010 WL 2671728 (W.D. Tex. July 1, 2010), X Technologies is voluntarily making reductions to its application for costs.

### A.    Fees for Service of Citation.

40.    Plaintiff agrees to reduce this component of its bill of costs to $55.00.

### B.    Video Services for Deposition.

41.    After reviewing the *Nilesh* case, Plaintiff withdraws its request for costs concerning video depositions of the following witnesses: Max Thrailkill, Terry Smith, Carl Hubbard, Bruce Petty, Elvis Foster, Kay Zdon and Loofie Gutterman.

42.    Defendant agrees that Plaintiff is entitled to recover costs for the video deposition of Michael Frey and Jeffrey Field as those videos were played at trial during the Plaintiff's case in chief. *See* Response at p. 19. Plaintiff is also entitled to recover costs for the video deposition of Michael Garner. Although the response states that "Plaintiff presented Michael Garner's testimony at trial live and by videotape," the reality is that Plaintiff was unable to present Mr. Garner during its case-in-chief at trial. While Mr. Garner ultimately appeared during

Defendant's case, he was unwilling to return correspondence and communications from Plaintiff's counsel.[53] Accordingly, Plaintiff was required to present Mr. Garner's testimony via video deposition during its case and Plaintiff should recover the associated costs.[54]

**C.      Real-Time Transcripts.**

43.      Concerning services provided by Mr. Myers, both sides relied heavily on the real time transcripts during trial.  For example, both parties repeatedly cited to the real time transcripts in arguing motions for directed verdict and during closing argument.[55] Accordingly, Mr. Myers' services were necessary for use in the case and Plaintiff should recover the associated costs.

## <u>PRAYER</u>

WHEREFORE, X Technologies, Inc. respectfully requests that the Court grant, in all respects, Plaintiff X Technologies, Inc.'s Application for and Memorandum in Support of Attorneys' Fees and Costs and for all other relief to which it may be entitled.

---

[53] Ex. D (Trial Transcript, Vol. 6, 08/30/2011) at 187.

[54] *See Nilesh*, 2010 WL 2671728 at *3.

[55] *See, e.g.*, Defendant's Motion for Directed Verdict [Dkt. #149] at pp. 5, 6, 11.

Dated: October 11, 2011

Respectfully submitted,

FULBRIGHT & JAWORSKI L.L.P.


By: /s/ Michael W. O'Donnell
      Michael W. O'Donnell
      State Bar No. 24002705
      modonnell@fulbright.com
      Dean V. Fleming
      State Bar No. 07122100
      dfleming@fulbright.com
      Blake W. Stribling
      State Bar No. 24070691
      bstribling@fulbright.com
300 Convent Street, Suite 2100
San Antonio, TX 78205-3792
Telephone: (210) 224-5575
Facsimile: (210) 270-7205

Attorneys for Plaintiff X Technologies, Inc.


## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2011, I electronically filed the foregoing with the Clerk of the Court using the ECF system for the Western District of Texas which will send notification of such filing to the following CM/ECF participants:

Millard A. Johnson
JOHNSON DELUCA KENNEDY & KURISKY P.C.
4 Houston Center, Suite 1000
1221 Lamar Street
Houston, Texas 77010

        /s/ Michael W. O'Donnell
          Michael W. O'Donnell

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

X TECHNOLOGIES, INC.,       §
                                     §
       Plaintiff,             §
                                       §
                                       §     CIVIL ACTION NO. 5:10-CV-319-XR
v.                                      §
                                       §
MARVIN TEST SYSTEMS, INC.,    §
                                       §
       Defendant.        §

# TRIAL TESTIMONY
# AUGUST 31, 2011
# VOLUME 7

xtech7 083111.txt

2    misrepresentation.  There is not.  And they have not asserted
3    any defense to the underlying basis for the tortious
4    interference claim.  So having not asserted it, and having,
5    having fraud and misrepresentation as the basis of the claim,
6    in terms of their conduct towards us, and towards the Air
7    Force, and what they were telling the Air Force, we believe
8    that -- and it is either the PJC or stir justice makes clear
9    by example, in fact I think it was Sturgess, Your Honor, that
10    makes clear, you know when you make -- when you exhibit
11    conduct to a third party, for example, when you make a
12    misrepresentation to a third party, like the Air Force, well,
13    the Air Force, they don't have to prove detranscript tall
14    reliance by the Air Force but the underrelying, underlying
15    tort which is the misrepresentation makes up the tortious
16    interference claim.  So that is how you have to analyze this
17    issue when you are talking about prospective as opposed to
18    existing, and I think PJC makes that very clear.
19            MR. JOHNSON:  May I be heard, you were.
20            THE COURT:  Yes.
21            MR. JOHNSON:  In point of fact, Your Honor I think
22    this is one of the times we might agree with counsel on terms
23    of how you analyze it, but if you lack at the comments in the
24    PJC, defenses to interference with prospective business
25    relations is -- it says in Sturgess, the very case they are

ROUGH TRANSCRIPT

24

1    talking about, the Supreme Court held that justification and
2    privilege are defenses in a claim for tortious interference,
3    interference with prospective relations and then it says only
4    to the September they are defenses to the independent
                        Page 21

xtech7 083111.txt

5    tortiousness of the defendant's conduct so we have to look at
6    what the independent basis that is alleged there is no doubt
7    we raised the issue of justification, legal justification, if
8    you look at their pleading pleadings, Your Honor, their
9    tortious interference claim on Page 19 says, Marvin -- and
10   this is where they get hoisted by conflating their contort,
11   the tort claim and the contract claim, Marvin -- are described
12   in detail in paragraph 42 of this plead being.  So you turn
13   back to paragraph 42, and the very first thing they said is,
14   Marvin Geotest breached the exclusive teaming agreement and
15   the written confirmation by, among other things, submitting
16   the concealed bid.  So there you have it.  Okay?  And a
17   defense to it is that we were justified in submitting our own
18   bid.  So they get hoisted on this one.  The justification
19   defense should be submitted.
20          THE COURT:  Yes.  I agree with your reading.  That
21   is the way I understand this.  I am going to leave that
22   paragraph in.
23          MR. FLEMING:  And so, Your Honor, what this ends up
24   doing, then, and just we will make our objection to the Court,
25   obviously but what this end up doing, then, is saying, okay,

ROUGH TRANSCRIPT

                                                          25

1    well if you have a legal right to go bid on a project, then
2    that is a justification, because that is what they are
3    claiming, and that is an improper submission of their good
4    faith, so we will make the objection at the appropriate time,
5    I just point that out to the Court.
6          THE COURT:  Thank you.  Page 8, fraud.  Any
7    objections to that?
                          Page 22

xtech7 083111.txt

14          THE COURT:  I don't want to retry any part of this

15     thing.

16          MR. JOHNSON:  I heard Judge Jamail say once in a

17     speech the important thing is to get a verdict and I will sort

18     it out later.  This one is on me, I if I have con ins I

19     covinced the Court this is the way to do it.  If by and large

20     we don't have an answer to a question, then that is going to

21     be on us, but we shouldn't submit it on the idea that the jury

22     is going to run right through and we can then just call that

23     question that is not the way any of the pattern jury charges

24     are configured her not configured in that form, they are

25     conditioned and this is a defense.  And if they find this,

                          ROUGH TRANSCRIPT

                                                         49


1      they shouldn't reach the tortious interference claim.

2           THE COURT:  I guess Mr. Fleming, I guess the other

3      way to think about this is, if they answer yes to what is now

4      called question number 13, wouldn't they probably just put

5      zero to the next line, so your issue about retrial becomes

6      kind of moot.

7           MR. FLEMING:  The point Your Honor.

8           THE COURT:  Thirteen stays the same.  Fourteen.

9           MR. FLEMING:  Your Honor, from plaintiff's

10     perspective, I think the Court would remove Part B based on

11     prior ruling.

12          THE COURT:  Any objection to that?

13          MR. JOHNSON:  None Your Honor.

14          THE COURT:  That is removed.

15          #04:  Part B should be the lost profits measure,

16     Your Honor, it should be the same lost profits measure as the

                          Page 44

xtech7 083111.txt

17    earlier question.

18            MR. JOHNSON:  As the tort comes very close to

19    becoming contract claim again Your Honor I guess we will have

20    to agree because they don't have any evidence of this and I am

21    going to object to the lost profits because I don't think that

22    is a proper measure under the tort claimed.  That is a

23    contract claim so we can put this in here but I am going to

24    object.  They don't have evidence of this damage, element of

25    damage.  And the lost profits isn't proper under this cause of

ROUGH TRANSCRIPT

50

1    action.

2            MR. FLEMING:  Absolutely we have evidence of this

3    measure, because but for the actions, I mean that was

4    Dr. Hubbard's testimony but for the actions of the defendant

5    and in preventing us from get getting this contract this is

6    our measure of dance.

7            MR. JOHNSON:  In responding to the solicitation,

8    there is no evidence of what they some ento respond is my

9    point.

10            MR. FLEMING:  Oh, I'm sorry.  Was counsel talking

11    about the way it is written now?

12            MR. JOHNSON:  I am talking about the way it is

13    written now I thought that's what you were arguing.

14            MR. FLEMING:  No, no, I am arguing that A.

15            MR. JOHNSON:  Confuse, Your Honor, I apologize.

16            MR. FLEMING:  I apologize.

17            THE COURT:  My understanding is what he wants A to

18    change to is the lost profits.

19            MR. JOHNSON:  Yes, sir.  Put it in there that way.
                    Page 45

90550545_1.TXT

21          MR. JOHNSON:  Number six for the basis that it

22    states an improper measure of damages.  The proper measure of

23    damages would be the cost incurred as submitted by the

24    defendant originally and is contained in the Court's original

25    charge, lost profits is a damages, it is a benefit of the

ROUGH TRANSCRIPT

62

1    bargain measure of damages, which relates solely to the

2    contractual claim and otherwise underlies underlying the fact

3    this tortious interference claim is boot strapped a contort

4    and should not be submitted.  We object to the submission of

5    the question on malice or fraud.  I believe that is question

6    number 7 on the basis that there is no evidence that any fraud

7    was committed and there certainly was no evidence of malice,

8    and putting those together is a comment in this situation, so

9    we object to the submission with the words malice or fraud,

10   because will because there is no evidence of malice in this

11   record and we contend that there is no evidence of fraud and

12   we believe that submission in this form is error.  We object

13   to the submission of the exemplary damages issue in any event

14   because there is no evidence to spun port an award of

15   exemplary damages in this case.  We further object to the

16   submission of all tort claims in the verdict form on the basis

17   that they all constitute impermissible con torts that is

18   question 8 through 11, in that these claims and all duties

19   arising in this case arise out of a contractual relationship

20   that was originally created by the NDA and pursuant to the

21   last provision of the NDA subsumed the teaming agreement, any

22   agreements falling from that, had to comply with the NDA, they

23   did not.  And so there is in basis for a tort claim, under the

Page 56

90550545_1.TXT

24    NDA we had no obligation to disclose anything.  We were

25    contractually excused from any duty to disclose.  So

ROUGH TRANSCRIPT

63

1    submission on this particular issue is error.

2         MR. JOHNSON:  Thank you, Your Honor.  Oh, wait a

3    minute.

4         THE COURT:  One more piece of error.

5         MR. JOHNSON:  One more piece of error has been

6    handed to me from behind me.  Oh.  We object to the submission

7    of the tortious interference questions, and we object to all

8    of the questions being submitted on the basis that there is no

9    causation.  The evidence is clear in this case that even if

10   Geotest had not bid, X Tech would not have been awarded a

11   contract from the Air Force, and, hence, there is no legally

12   connectible claim between their damage claim and any liability

13   on the part -- anything that Geotest did.  So we object to

14   basically we are reurging our directed verdict in this but

15   causation has been cut off by the fact they have no damages as

16   a result of anything Geotest did.  Thank you, Your Honor.

17        THE COURT:  Thank you.  This may be the most error I

18   have ever committed.

19        MR. JOHNSON:  And we still like you.

20        THE COURT:  And if I committed any errors hopefully

21   the jury will correct me and if not then we will see what they

22   do and try to fix it up later.  Are we ready now?  Law law

23   yes.

24        THE COURT:  Copies for the jurors?

25        MS. HINE:  Jan still has them.

ROUGH TRANSCRIPT
Page 57

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

X TECHNOLOGIES, INC.,                   §
                                        §
        Plaintiff,                      §
                                        §
                                        §   CIVIL ACTION NO. 5:10-CV-319-XR
v.                                      §
                                        §
MARVIN TEST SYSTEMS, INC.,              §
                                        §
        Defendant.                      §

# TRIAL TESTIMONY
# AUGUST 23, 2011
# VOLUME 2

90550538_1.TXT

2    that the answers were under oath and that they were truth true

3    and correct, right?

4    A.  Right.

5    Q.  Now?

6    A.  And now we are talking about the teaming arrangement

7    versus the teaming agreement document, right.

8    Q.  Well, let's look at -- you and I can agree that the

9    nondisclosure agreement specifically states that the NDA is

10   not part of a teaming agreement?

11   A.  Right.

12   Q.  Okay.  So even though you swore under oath in this lawsuit

13   that it was part of the teaming agreement, the document that

14   you -- that X Tech drafted the NDA says it is not part of the

15   teaming agreement?

16   A.  Right.  It is not part of the written teaming agreement.

17   Q.  Let's look at Defendant's Exhibit No. 8.  Hold on just a

18   moment.  We want to make sure we look at the same thing.  I'm

19   sorry.  Teaming agreement.  Does Defendant's Exhibit No. 8 is

20   the NDA, right?  And it says, in paragraph number ten,

21   paragraph numbered ten that this nondisclosure agreement shall

22   not be construed as a teaming, consult, joint venture or other

23   stump arrangement, rather the parties here to expressly agree

24   that this agreement is for the purpose of protecting

25   confidential information only, right?

ROUGH TRANSCRIPT

87

1    A.  Right.

2    Q.  So after this lawsuit was filed you swore under oath this

3    document was part of the teaming arrangement or teaming

4    agreement that you had with Geotest, right?

Page 78

90550538_1.TXT

5   A.  Overall.  This is the first step that leads us into a

6   teaming agreement.

7   Q.  And you stick to that, right?

8   A.  Right.

9   Q.  Okay.  Let's look at the next provision down, scroll down

10  for me, Minna.  Paragraph number 17 says, this agreement

11  contains the entire understanding between the parties relative

12  to the protection of confidential information and supercedes

13  all prior and collateral communications, reports and agrees

14  between the parties in respect there to, right?

15  A.  Right.

16  Q.  And it is part of the teaming agreement -- sitting here in

17  front of this jury you say this is part possess the teaming

18  agreement, right?

19  A.  This is a document that allows us to share information so

20  we can form that teaming agreement.

21  Q.  And it is part -- you sworn under oath it is part November

22  the arrangement, the teaming arrangement?

23  A.  Part more the teaming agreement.

24  A.  Right.

25  Q.  And the next sentence says no change, modification, at

ROUGH TRANSCRIPT

88

1   investigation or in addition to any provision here of shall be

2   binding unless in writing, right?

3   A.  Right.

4   Q.  And there is no further teaming agreement in writing, is

5   there?

6   A.  There is a proposal that Geotest sent us is the teaming

7   agreement.

Page 79

90550538_1.TXT

23    teaming agreements, not what forms our teaming agreement or

24    what the team agreement document is, but just what it says on

25    top.

ROUGH TRANSCRIPT

157

1                 MR. JOHNSON:  Your Honor, may I approach?

2                 THE COURT:  Come on up.

3                 (Bench conference, as follows:)

4                 MR. JOHNSON:  Your Honor, I used this document

5      defensively.  He, it is a hearsay document as to the

6      plaintiff, this is their discovery responses so he shouldn't

7      be permitted to go other than to the point I raised with him

8      regarding that particular document, being on the list.  He

9      should not be able to bolster his arguments about what

10     constituted the teaming agreement.  He is showing that to the

11     jury.

12                MR. O'DONNELL:  We should have an opportunity to

13     explain what the document was.  Mr. Johnson department present

14     the whole interrogatory.  He just took a piece and this is an

15     opportunity for the witness to at least say what this list was

16     and that Mr. Johnson used.

17                THE COURT:  If I remember the testimony of this

18     witness, the answer to the interrogatory, and this was the

19     exhibit that was referenced in the answer, right?

20                MR. O'DONNELL:  Yes, Your Honor.

21                THE COURT:  That is overruled.

22                (End of bench conference.).

23     BY MR. O'DONNELL:

24     Q.  And, Mr. Ayala, to your understands is there a difference

25     between the nondisclosure agreement and the teaming agreement.

Page 142

90550538_1.TXT

ROUGH TRANSCRIPT

158

1    There are.

2    Q.   Okay.   But do you see some relationship between the two?

3    A.   Yes.

4              MR. JOHNSON:   Objection, leading Your Honor.

5              THE COURT:   That is sustained.

6    BY MR. O'DONNELL:

7    Q.   What if any relationship do you see between the

8    nondisclosure agreement and the teaming agreement?

9    A.   The NDA is what starts the talks about a teaming

10   relationship.   You normally, in the industry, don't start a

11   teaming relationship talk without having an NDA in place.

12   Q.   And what is the NDA designed to protect?

13   A.   The confidentiality, the proposal information, your

14   strategy, your partners, and everything confidential to the

15   proposal.

16             MR. O'DONNELL:   Pass the witness.

17             THE COURT:   Anything further?

18             MR. JOHNSON:   Yes, sir.

19             THE COURT:   It is limited just to the --

20             MR. JOHNSON:   Yes, sir.   And I appreciate the Court

21   reminding me of that.

22                        *-*-*-*-*-*-*-*

23                   RECROSS EXAMINATION

24   BY MR. JOHNSON:

25   Q.   If this court will just give me a moment to look at my

ROUGH TRANSCRIPT

159

Page 143

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| X TECHNOLOGIES, INC. | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| | § | CIVIL ACTION NO. 5:10-cv-319-xr |
| V. | § | |
| | § | |
| MARVIN TEST SYSTEMS, INC., | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |

### SUPPLEMENTAL AFFIDAVIT OF MICHAEL W. O'DONNELL

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, on this day appeared Michael W. O'Donnell, who upon his oath stated the following:

1.  My name is Michael W. O'Donnell. I am at least 21 years of age, of sound mind, capable of making this affidavit, and fully competent to testify to the matters stated herein. I have personal knowledge of the statements contained herein, and they are true and correct.

2.  I am the lead counsel for Plaintiff X Technologies, Inc. in the above-referenced litigation. I am familiar with the legal services that have been rendered by Fulbright & Jaworski L.L.P. in connection with this matter. I have conducted a detailed review of Plaintiff's attorneys' fees and litigation expenses incurred in this matter, including review of the invoice records of Fulbright & Jaworski L.L.P.

3.  On behalf of X Technologies, I requested mediation of the case in writing and orally with Mr. Johnson. Geotest refused X Technologies' attempts to mediate this case.

4.  Attached hereto as Exhibit 1 is a chart of aggregate statistics showing total hours sought per attorney and the corresponding rate. The rates include discounts from Fulbright & Jaworski L.L.P.'s standard rates of 10% for Mr. O'Donnell and more than 20% for Mr. Fleming. Exhibit 1 demonstrates reasonable hours times reasonable rates for the attorney services provided in connection with this matter.

Further, the fees reflected on Exhibit 1 are usual and customary for fees paid by our clients and are usual and customary for complex commercial litigation cases in San Antonio, Texas.

5.    I personally reviewed each monthly bill in this matter on a line-by-line basis and eliminated billings for work that was unproductive, excessive or redundant. In total, Plaintiff's counsel performed 2,407 hours of work on this matter. I wrote-off 240 (or 9.5%) of the hours worked, reducing the total bill by $66,409.75 (or 7.4%). Attached hereto as Exhibit 2 is a true and correct spreadsheet detailing the monthly and cumulative write-offs. There was a $24,517 write-off from the trial invoice that reduced the fees chargeable to X Technologies for attorney participation in trial.

FURTHER AFFIANT SAYETH NOT.

Michael W. O'Donnell

SUBSCRIBED AND SWORN TO BEFORE ME on this 11th day of October, 2011.

DANA THOMPSON
Notary Public
State of Texas
My Comm. Exp. 07-22-2015

Notary Public in and for
the State of T E X A S

90565143.1/11002760         - 2 -

# EXHIBIT 1

**REQUESTED FEES**

| ATTORNEY | | HOURS | RATE | ADJUSTED FEE REQUEST | |
|---|---|---|---|---|---|
| M. O'DONNELL | 2010 | 233.52 | 470 | $ | 109,752.05 |
| | 2011 | 517.29 | 495 | $ | 256,059.28 |
| | | | | | |
| D. FLEMING | 2010 | 36.75 | 450 | $ | 16,536.38 |
| | 2011 | 252.43 | 495 | $ | 124,950.00 |
| | | | | | |
| B. STRIBLING | 2010 | 220.41 | 235 | $ | 51,796.94 |
| | 2011 | 400.60 | 295 | $ | 118,176.26 |
| | | | | | |
| A. SENARY | | 114.31 | 240 | $ | 27,435.00 |
| | | | | | |
| R. SMITH | 2010 | 6.25 | 350 | $ | 2,187.50 |
| | 2011 | 6.3 | 395 | $ | 2,488.50 |
| | | | | | |
| R. KANUSKY | | .38 | 425 | $ | 159.38 |
| | | | | | |
| | | **1788.24** | | **$** | **709,541.29 TOTAL** |

# EXHIBIT 2

| Period | Description | Worked | Bill | Write Up/Down | Percent | Cumulative | Cumulative Percent |
|--------|-------------|--------|------|---------------|---------|------------|---------------------|
| 0410 | HOURS | 11.50 | 11.20 | - .30 | -2.6% | - .30 | -2.6% |
|  | AMOUNT | 5351.00 | 5240.00 | -111.00 | -2.1% | -111.00 | -2.1% |
|  |  |  |  |  |  |  |  |
| 0510 | HOURS | 19.00 | 18.75 | - .25 | -1.3% | - .55 | -1.8% |
|  | AMOUNT | 6983.75 | 6896.25 | -87.50 | -1.3% | -198.50 | -1.6% |
|  |  |  |  |  |  |  |  |
| 0610 | HOURS | 39.00 | 36.00 | -3.00 | -7.7% | -3.55 | -5.1% |
|  | AMOUNT | 14275.00 | 13453.75 | -821.25 | -5.8% | -1019.75 | -3.8% |
|  |  |  |  |  |  |  |  |
| 0710 | HOURS | 18.50 | 18.50 | .00 | --- | -3.55 | -4.0% |
|  | AMOUNT | 5995.00 | 5995.00 | .00 | --- | -1019.75 | -3.1% |
|  |  |  |  |  |  |  |  |
| 0810 | HOURS | 41.25 | 41.25 | .00 | --- | -3.55 | -2.8% |
|  | AMOUNT | 12951.25 | 12951.25 | .00 | --- | -1019.75 | -2.2% |
|  |  |  |  |  |  |  |  |
| 0910 | HOURS | 145.75 | 117.00 | -28.75 | -19.7% | -32.30 | -11.8% |
|  | AMOUNT | 37558.75 | 31006.25 | -6552.50 | -17.5% | -7572.25 | -9.1% |
|  |  |  |  |  |  |  |  |
| 1010 | HOURS | 70.50 | 64.25 | -6.25 | -8.9% | -38.55 | -11.2% |
|  | AMOUNT | 24741.25 | 23422.50 | -1318.75 | -5.3% | -8891.00 | -8.2% |
|  |  |  |  |  |  |  |  |
| 1110 | HOURS | 72.75 | 72.75 | .00 | --- | -38.55 | -9.2% |
|  | AMOUNT | 24836.25 | 24836.25 | .00 | --- | -8891.00 | -6.7% |
|  |  |  |  |  |  |  |  |
| 1210 | HOURS | 153.25 | 144.75 | -8.50 | -5.6% | -47.05 | -8.2% |
|  | AMOUNT | 61762.50 | 58733.75 | -3028.75 | -4.9% | -11919.75 | -6.1% |
|  |  |  |  |  |  |  |  |
| 0111 | HOURS | 120.25 | 116.00 | -4.25 | -3.5% | -51.30 | -7.4% |
|  | AMOUNT | 41998.75 | 41000.00 | -998.75 | -2.4% | -12918.50 | -5.5% |
|  |  |  |  |  |  |  |  |
| 0211 | HOURS | 101.00 | 95.50 | -5.50 | -5.5% | -56.80 | -7.2% |
|  | AMOUNT | 34882.50 | 33420.00 | -1462.50 | -4.2% | -14381.00 | -5.3% |
|  |  |  |  |  |  |  |  |
| 0311 | HOURS | 251.25 | 195.00 | -56.25 | -22.4% | -113.05 | -10.8% |
|  | AMOUNT | 92900.00 | 75717.50 | -17182.50 | -18.5% | -31563.50 | -8.7% |
|  |  |  |  |  |  |  |  |
| 0411 | HOURS | 88.75 | 84.00 | -4.75 | -5.4% | -117.80 | -10.4% |
|  | AMOUNT | 38218.75 | 37171.25 | -1047.50 | -2.7% | -32611.00 | -8.1% |
|  |  |  |  |  |  |  |  |
| 0511 | HOURS | 107.75 | 104.00 | -3.75 | -3.5% | -121.55 | -9.8% |
|  | AMOUNT | 44232.50 | 43482.50 | -750.00 | -1.7% | -33361.00 | -7.5% |
|  |  |  |  |  |  |  |  |
| 0611 | HOURS | 98.50 | 93.75 | -4.75 | -4.8% | -126.30 | -9.4% |
|  | AMOUNT | 37210.00 | 35645.00 | -1565.00 | -4.2% | -34926.00 | -7.2% |
|  |  |  |  |  |  |  |  |
| 0711 | HOURS | 183.75 | 163.25 | -20.50 | -11.2% | -146.80 | -9.6% |
|  | AMOUNT | 60350.00 | 55722.50 | -4627.50 | -7.7% | -39553.50 | -7.3% |
|  |  |  |  |  |  |  |  |
| 0811 | HOURS | 170.00 | 162.75 | -7.25 | -4.3% | -154.05 | -9.1% |
|  | AMOUNT | 65927.50 | 63588.75 | -2338.75 | -3.6% | -41892.25 | -6.9% |
|  |  |  |  |  |  |  |  |
| 0911 | HOURS | 714.25 | 639.00 | -75.25 | -10.5% | -229.30 | -9.5% |
|  | AMOUNT | 288562.50 | 264045.00 | -24517.50 | -8.5% | -66409.75 | -7.4% |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
| TOTAL | HOURS | 2407.00 | 2177.70 | -229.30 |  |  |  |
|  | AMOUNT | 898737.25 | 832327.50 | -66409.75 |  |  |  |

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

X TECHNOLOGIES, INC.,                    §
                                         §
      Plaintiff,                     §
                                         §
                                         §    CIVIL ACTION NO. 5:10-CV-319-XR
                                         §
v.                                       §
                                         §
MARVIN TEST SYSTEMS, INC.,               §
                                         §
      Defendant.                     §

# TRIAL TESTIMONY
# AUGUST 30, 2011
# VOLUME 6

90550543_1.TXT

18    A.   Yeah.  If it was determined we were going to go into

19    discussions, sure we would have sat down.

20    Q.   Absolutely, right?  I mean there is nothing wrong with X

21    Technologies why you wouldn't sit down with them, right?

22    A.   Well, if you are going to go into formal discussions with

23    the government, that has to be -- that is a formal process,

24    and it is a time issue, so if we would have done that, yes,

25    but, again, we are speculating, the government chose not to do

ROUGH TRANSCRIPT

187

1    that.

2    Q.   Well, because, of course, the contract was awarded to

3    Geotest, correct?  At the end of the day?

4    A.   Yeah, because we had a quote for less money.

5    Q.   Right.  And so, everything you are telling us, I mean that

6    impacted your thinking completely concerning what was going on

7    in December of 2009, correct?  You had this quote for

8    2.4 million that looked attractive, right?

9    A.   Sure.

10   Q.   Okay.  Now, sir, you have traveled to San Antonio today to

11   provide your testimony, correct?

12   A.   Yes.

13   Q.   And is Geotest paying the expenses for that?

14   A.   The defendant is, yes.

15   Q.   Okay.  So Geotest is paying your flight, your

16   accommodations, all of that?

17   A.   Sure.

18   Q.   Okay.  Have you talked to the lawyers for Geotest about

19   your testimony, sir?

20   A.   Sure.

90550543_1.TXT

21  Q.  Okay.  Are you aware that my decide has been trying to

22  contact you for more than two weeks, sir?

23  A.  You left me a phone call, yes.

24  Q.  Okay.  And you didn't return that call, did you, sir?

25  A.  No, I did not.

ROUGH TRANSCRIPT

188

1        MR. O'DONNELL:  Pass the witness.

2        THE COURT:  Mr. Johnson.

3        MR. JOHNSON:  Yes.

4              *-*-*-*-*-*-*-*

5              REDIRECT EXAMINATION

6  BY MR. JOHNSON:

7  Q.  Let's go from the back and work forward, first of all, you

8  and I have talked about you coming to testify; is that right?

9  A.  Yes.

10  Q.  Have I ever suggested to you what your testimony ought to

11  be?

12  A.  No.  You have suggested that I tell the truth.

13  Q.  And we are paying your expenses, correct?

14  A.  Yes.

15  Q.  Because you had to fly down from Ogden, Utah?

16  A.  Yes.  The federal government wouldn't pay for my intenses

17  to come down here.

18  Q.  why did you come down here?

19  A.  Because you asked and I feel it is the right thing to do.

20  Q.  Okay.  Now, first of all, there was -- there has never

21  been a finding that X Technologies bid at $3.2 million by the

22  SSA was fair and reasonable, right?

23  A.  That is correct.

Page 170